**NATIONAL UNION INSURANCE COMPANY OF PITTSBURGH, PA., Plaintiff,**

v.

**HOLMES & GRAVEN, Chartered, James Holmes, Daniel Nelson, and Washington Housing & Redevelopment Authority, Defendants and Third–Party Plaintiffs,**

v.

**AMERICAN HOME ASSURANCE COMPANY, and Virginia Surety Company, Inc., Third–Party Defendants.**

**Civ. No. 3–96–1129(RHK/RLE).**

United States District Court, D. Minnesota, Third Division.

June 19, 1998.

Ludwig Broderick Gartner, Jr., Heidi A. Schneider, Gartner & Schupp, Minneapolis, MN, Kenneth A. Sagat, Neil R. Morrison, for National Union Ins. Co. of Pittsburgh, PA.

Richard Bruce Allyn, Barbara Jeanne Haley, Robins Kaplan Miller & Ciresi, Minneapolis, MN, for Holmes & Graven, James Holmes and Daniel Nelson.

Charles A. Valente, Elizabeth S. McKelvey, Edward E. McNally, Rita M. Alliss, Altheimer & Gray, Chicago, IL, J. Michael Dady, Jeffery S. Haff, Dady & Garner, Minneapolis, MN, for Washington County Housing & Redevelopment Authority.

Ludwig Broderick Gartner, Jr., Heidi A. Schneider, Gartner & Schupp, Minneapolis, MN, Kenneth A. Sagat, Neil R. Morrison, for American Home Assurance Co.

Thomas Jerome Shroyer, Winfred S. Herzog, paul Joseph Yechout, Moss & Barnett, Minnepolis, MN, for Virginia Surety Co.

## REPORT AND RECOMMENDATION

ERICKSON, United States Magistrate Judge.

### I. *Introduction*

This matter came before the undersigned United States Magistrate Judge pursuant to a special assignment, made in accordance with the provisions of Title 28 U.S.C. § 636(b)(1)(B), upon the cross-Motions of the Plaintiff National Union Insurance Company of Pittsburgh, Pennsylvania ("National Union"), and of the Third–Party Defendant Virginia Surety Company, Inc. ("Virginia Surety"), for Summary Judgment.

A Hearing on the Motions was conducted on November 17, 1997, at which time National Union appeared by Heidi A. Schneider, Esq.; Virginia Surety appeared by W. Scott Herzog, Esq.; and no appearances were made by, or on behalf of, the remaining parties to this action.[1]

For reasons which follow, we recommend that a final Judgment be entered which grants National Union's Motion in part, and Virginia Surety's Motion in part, as we conclude that neither insurer is obligated, under the terms of their respective policies, to indemnify the Defendants, Holmes & Graven, Chartered ("Holmes & Graven"), James Holmes ("Holmes"), and Daniel Nelson ("Nelson"), for the claims litigated, and ultimately settled, in *Washington County Housing and Redevelopment Authority vs. Holmes & Graven, Chartered, James Holmes, and Daniel Nelson* (Court File No. 82–C2–96–00252, Minnesota District Court for Washington County). We recommend that both Motions be denied insofar as each insurer has attempted to shift the duty to defend, and to indemnify, onto the other.

### II. *Factual and Procedural History*

The cross-Motions were submitted on the parties' Stipulated Facts, which memorializes their agreement that the issues presented are properly resolved as a matter of law. Accordingly, the underlying facts, upon which are Recommendation is based, are not in material dispute.

National Union is a Pennsylvania corporation, which has its principal place of business in the State of New York; Virginia Surety is an Illinois corporation, which has its principal place of business in that State; and the

---

1. By Order dated November 18, 1997, the District Court, the Honorable Richard H. Kyle presiding, dismissed with prejudice, the claims by and against the Defendants, and Third–Party Plaintiffs, Holmes & Graven, Chartered, James Holmes, Daniel Nelson and Washington County Housing & Redevelopment Authority. As a consequence, the only remaining claims are those of National Union and Virginia Surety.

Third–Party Defendant American Home Insurance Company ("American Home") is a New York corporation, which has its principal place of business in the State of New York. National Union and American Home are wholly owned subsidiaries of the American International Group.

Holmes & Graven was a Minneapolis law firm which had, among its clients, the Washington County Housing & Redevelopment Authority ("HRA"). Specifically, during the period of its retention, Holmes & Graven served as the HRA's general counsel with respect to all matters, including all municipal tax-exempt financing, which was undertaken by the HRA. In 1988, the HRA entered a municipal service agreement with the City of Cottage of Cottage Grove, Minnesota, which related to the building and development of a 180–unit, multifamily, housing development which became known as "Woodland Park."

In 1990, and in connection with the Woodland Park development, Holmes & Graven prepared documentation, including bonds, a Trust Indenture between the HRA and the First Trust National Association, which served as the Trustee for the bonds ("the Trustee"), and a Legal Opinion, dated May 9, 1990, which the firm rendered in its capacity as the HRA's counsel. As pertinent here, Holmes & Graven expressed an opinion, in its Legal Opinion, that the financing documents, including the Mortgage, contained legally binding obligations upon the HRA, subject to the qualification that the firm was expressing "no opinion as to the right of the Trustee to obtain possession of the Premises (as defined in the Mortgage) prior to foreclosure and the running of the redemption period other than in compliance with *Minn. Stat.* § 559.17 and § 576.01, subd. 2 * * * ." *Exhibit B*, at page 2.

During 1992, the revenues that remained, after the expenses which were associated with the Woodland Park development's debt servicing had first been satisfied, were insufficient to meet the complex's operating expenses, and the HRA, and the Trustee, reached a discord concerning each other's legal rights, and obligations, under the pertinent financing documents. As a result of this discord, in March of 1994, the HRA engaged Holmes & Graven to commence a Declaratory Judgment action, in State Court, in order to obtain a judicial declaration concerning the respective rights, and obligations, of the HRA, and of the Trustee, under the financing documents.

On or about May 12, 1994, the declaratory action was commenced in the Minnesota District Court for the Tenth Judicial District. In this action, the HRA sought "a declaration against * * * [the] Trustee that the HRA ha[d] no personal liability for any of the obligations under the [Trust] Indenture and ha[d] no obligation to use non-Project funds to fund operating shortfalls in the Project." *Exhibit C*, at page 4. On or about August 3, 1994, the Trustee interposed its Answer to the HRA's Complaint, and also asserted a Counterclaim against the HRA, in which the Trustee sought a declaration that, in accordance with Section 13 of the Mortgage document, the Trustee "[wa]s entitled, but not obligated, as agent of the HRA, to rent, lease, or let the Project, and collect Project revenues, with rights, powers, immunities, exoneration of liability, and rights of recourse and indemnity of Project possession on behalf of the HRA." *Exhibit D*, at pages 4–5. Stated in plain English, the Trustee sought a declaration that it had the right, under the Mortgage, to rent out, and collect the rents, for the apartments in the Woodland Park complex, and that it also had the right to take possession of the development.

The action came to Trial on January 18, 1995, and, on June 6, 1995, the Court issued its Findings of Fact, Conclusions of Law, Order, and Order for Judgment. With regard to the HRA's requested declaration— that the debts of the project were non-recourse with respect to the HRA—the Court made the following Findings of Fact:

1. That on May 9, 1990, [the HRA] issued $12,343,833.00 in Washington County Housing and Redevelopment Authority Governmental Housing Revenue Refunding Bonds ("Woodland Park Apartments Project"), Series 1990A and Series 1990B ("the Bonds") pursuant to the terms of a Trust Indenture dated May 1, 1990 ("the Indenture") between the HRA and [the Trustee].

2. The Bonds * * * are known as "assential function bonds" in that they were is-

sued by the HRA to finance a project to be owned by the HRA, as contrasted with "conduit financing bonds" where the issuer loans the bond proceeds to a private developer who owns the project.

\* \* \* \* \* \*

5. The HRA's attorney, Daniel Nelson [an attorney with Holmes & Graven] was charged with drafting the financing documents in connection with the issuance of the Bonds. As a model, Nelson used documents provided by the underwriter for the Bonds, Downing & Co. ("Downing"). The model documents had been drafted by Butler & Binion, a law firm in Texas, and contained provisions with which Nelson was not familiar. The Butler & Binion documents were not drafted in connection with the issuance of essential governmental purpose housing bonds, but rather conduit financing bonds.

\* \* \* \* \* \*

11. In the execution draft of the Indenture, section 5.11 provides that:

> "[I]f the total amount on deposit in the Tax Reserve Account shall not be sufficient to pay \* \* \* taxes, payments in lieu of taxes, assessments, and premiums, the Issuer shall pay the excess amount of such taxes, payment in lieu of taxes, any other municipal charges, assessments, and premiums *directly.*" [Author's emphasis].

12. During the drafting process, Nelson had modified Section 5.11 to include the statutory payment in lieu of taxes (PILOT) obligation and the HRA's obligation under the Municipal Service Charge Agreement. Throughout the various drafts, however, Nelson never made any change to the language of section 5.11 that if amounts on deposit with the Trustee were insufficient to meet PILOT, and the municipal services charge obligations, the HRA was obligated to pay such amounts "directly."

13. In the execution draft of the Indenture, Section 5.12 describes the Replacement Reserve Account, which provides funds to meet the costs of replacements or items of extraordinary maintenance which may be required to keep the Project in sound condition. This section provides that:

> [I]f the total amount on deposit in the Replacement Reserve Account shall not be sufficient to pay all such repair and replacement costs when they become due, the issuer shall pay the excess amount of such costs *directly.* [Author's emphasis].

14. Throughout the various drafts, Nelson never made any change to the language of Section 5.12 that if the amounts on deposit with the Trustee were insufficient to meet such repair and replacement costs, the HRA was obligated to pay such amounts "directly."

15. Nelson included the "directly" language in Sections 5.11 and 5.12 of the Indenture because it was in the Butler & Binion model. When Nelson incorporated the term "directly" into Sections 5.11 and 5.12, he did not consider its meaning or effect.

16. Nelson testified that Sections 5.11 and 5.12 made no sense in the final version of the Indenture because of the modification to the flow of funds made at the closing. Specifically, the third draft of the Indenture changed the flow of funds for and through the Project from a gross revenue pledge into a net revenue pledge. At the closing, however, the parties agreed to change the flow of funds back to the gross revenue pledge that had existed in Nelson's original draft of the Indenture. However, throughout these changes to the flow of funds and all other changes to the Indenture, the "directly" language remained unchanged at all times.

*Exhibit E,* at pages 1–2, 4–5.

In accordance with these findings, the Court issued the following Conclusions of Law:

7. That the Court concludes that the most reasonable interpretation of Sections 5.11 and 5.12—an interpretation that gives those provisions a plain and ordinary meaning—is that by agreeing to pay certain obligations "directly," if necessary, the HRA agreed to be personally responsible and thus personally liable for those obligations.

8. That the Court holds that pursuant to Section 5.11 of the Indenture, if the total amount on deposit with the Trustee is not

sufficient to pay taxes, PILOT payments, municipal services, charges, assessments, or premiums, the HRA's obligation to pay the excess amounts of such taxes, PILOT payments, municipal services charges, assessments, or premiums is a recourse obligation.

9. That the Court holds that pursuant to Section 5.12 of the Indenture, if the total amount on deposit with the Trustee is not sufficient to pay the cost of replacements or items of extraordinary maintenance which may be required to keep the Project in sound condition, the HRA's obligation to pay the excess amount of such repair and replacement costs is a recourse obligation. *Id.* at pages 9–10.

As an ultimate Conclusion of Law, the Court "denie[d] the HRA's request for a declaration that other than for the Gross-up Amount defined in Section 3.04, the HRA has no personal liability for any of its obligations under the Indenture and that it has no obligation to use non-Project funds to fund operating shortfalls on the Project." *Id.* at page 10. Judgment was entered accordingly and, as a result of this Judgment, the HRA asserts that it has incurred costs in excess of five million dollars. See, *Exhibit N,* at page 4.

With regard to the Trustee's Counterclaim, the Court concluded that the Trustee could neither seek the appointment of a receiver for the Woodland Park complex, nor exercise its rights under the Mortgage's assignment of rents provision, without first obtaining a mortgage foreclosure of the Project. Ultimately, this aspect of the Trial Court's Order was reversed by the Minnesota Court of Appeals which, by Order dated April 9, 1996, held that the Trustee could enforce the assignment of rents provision, without first obtaining a mortgage foreclosure. *Washington County Housing and Redevelopment Authority v. First Trust National Association,* 1996 WL 175433 *3–4 (Minn.App., April 16, 1996), rev. denied (Minn., June 19, 1996). In that same Order, however, the Minnesota Court of Appeals affirmed the Trial Court's rulings with respect to the HRA's obligation to directly pay certain of the projects expenses, from non-project funds, as recourse obligations. *Id* at *2–3.

In the months which followed the issuance of the Trial Court's Order, several events transpired which are germane to the issues presented. On June 15, 1995, Holmes resigned his position as a shareholder in Holmes & Graven, and joined, instead, the newly established law firm of Holmes & Galey, Ltd. ("Holmes & Galey"). At about this same time, Holmes & Graven changed its name to Kennedy & Graven, Chartered ("Kennedy & Graven"). In addition, at some time in the latter part of June of 1995, Kennedy & Graven transferred all of its files, concerning the HRA, to Holmes & Galey.[2]

On June 30, 1995, counsel for the Trustee notified Kennedy & Graven of a professional malpractice claim against that firm, arising from the written Legal Opinion that Holmes and Graven had rendered, on May 9, 1990. Specifically, the Trustee advised of the following basis for its claim:

> The Opinion stated that all obligations of the HRA under the Mortgage, Assignment of Rents and Security Agreement (the "Mortgage"), which secures the Bonds, were legally enforceable against the HRA. Those obligations under Section 13 of the Mortgage included the remedy of the Indenture Trustee as mortgagee to exercise the non-possessory right to assume control of the collateral project property, and operate it on behalf of the HRA, upon the occurrence of an event of default.

> The Opinion was qualified regarding enforce-ability of possessory rights of the mortgagee, but was unqualified with respect to the enforceability of the exercise of remedies under Section 13 of the Mortgage without taking possession of the collateral project property.

> With regard to the legal availability of such non-possessory remedy, Holmes & Graven, Chartered argued at trial that

---

**2.** In turn, Holmes & Galey transferred the litigation file, from the HRA State declaratory action, to the law firm of Fredrikson & Byron, which represented the HRA in its appeal of the State Trial Court's Judgment. In December of 1995,

Holmes & Galey was replaced, as general counsel for the HRA, by the law firm of McGrann, Shea, Franzen, Carnival, Straughn & Lamb, and, as a consequence, Holmes & Galey transferred its remaining HRA files to that law firm.

such remedy was not legally enforceable, and the trial court so held.

*Exhibit F*, at page 1.

Accordingly, counsel for the Trustee requested "that notice of this claim be submitted to Holmes & Graven Chartered's professional liability insurance carrier." *Id.* at page 2. Ultimately, however, the Trustee elected not to pursue this claim since, as we have noted, the Minnesota Court of Appeals subsequently reversed the District Court's Judgment of which the Trustee was complaining.

During this period of time, Kennedy & Graven's professional liability insurance coverage was provided by National Union. The policy, which was then in effect, expired on September 30, 1995, and was a "claims made" policy.[3] On July 6, 1995, Kennedy & Graven sent written Notice of the Trustee's claim to its insurance agent who, on or about July 14, 1995, forwarded the Notice to National Union.[4] In June of 1995, Kennedy & Graven also submitted to its insurance agent an application to renew its professional liability insurance coverage with National Union. As well, on or about September of 1995, Kennedy & Graven submitted an application for professional liability insurance to Virginia Surety and, soon thereafter, Virginia Surety issued to Kennedy & Graven an attorney's professional liability policy which provided coverage beginning on September 30, 1995— upon the expiration of the National Union policy—and continuing until September 30, 1996. As with the National Union policy, the Virginia Surety policy was a "claims made" policy. For its part, Holmes & Galey sought, and obtained, professional liability insur-

ance—on a "claims made" basis—from American Home, and this policy provided coverage from June 16, 1995, until June 16, 1996.

In July of 1995, the HRA retained the Chicago law firm of Altheimer & Gray to represent the HRA in connection with an attorney malpractice claim against Holmes & Graven, and certain of its attorneys. The asserted basis for this claim was Holmes & Graven's representation of the HRA, during the financing of the Woodland Park complex, and the resultant State Court litigation between the HRA and the Trustee. On October 30, 1995, Kennedy & Graven received correspondence from Altheimer & Gray, which contained written Notice of a potential professional malpractice claim against Kennedy & Graven.[5] As here pertinent, Altheimer & Gray asserted that "the conduct of Holmes & Graven is directly responsible for the HRA becoming obligated for certain costs of the Project by virtue of negligently preparing and/or negotiating the documents relating to the 1990 Bonds, and by failing to apprise the HRA of the nature and extent of its direct obligations thereunder." *Exhibit N*, at page 1. More specifically, Altheimer & Gray asserted that, "[a]s a direct result of the negligence of Holmes & Graven, through attorney Daniel Nelson and perhaps other partners and/or associates involved in the drafting and negotiation of the Indenture, Sections 5.11 and 5.12 have been determined by the District Court to impose a direct recourse obligation on the HRA for the payment of certain amounts in lieu of taxes and other special charges, and to provide for repairs to the Project." [6] *Id.* In this same

---

3. A "claims made" policy, which is also referred to as a "discovery" policy, "is a policy under which coverage is provided if the insured conduct is 'discovered and brought to the insurer's attention during the term of the policy.'" *Winthrop & Weinstine, P.A. v. Travelers Casualty and Surety Co.*, 993 F.Supp. 1248, 1254 (D.Minn.1998), quoting *Esmailzadeh v. Johnson and Speakman*, 869 F.2d 422, 424 (8th Cir. 1989) (applying Minnesota law); see also, *N.K.K. v. St. Paul Fire & Marine Insurance Co.*, 555 N.W.2d 21, 25 (Minn.App.1996), rev. denied (Minn., December 23, 1996). Under a "claims made" policy, it does not matter when the act itself occurred. *Id.* This is in contrast with an "occurrence" policy, which is a policy in which coverage is provided "if the insured conduct 'occurred within the term of the policy, even if the term has since expired.'" *Id.*, quot-

ing *Esmailzadeh v. Johnson and Speakman*, supra at 424.

4. Attached to the Notice, and also forwarded to National Union by the insurance agent, were copies of the Trustee's Notice of Motion and Motion for Amended Findings of Fact, Conclusions of Law, and Judgment in the State Court action.

5. Altheimer & Gray also forwarded a copy of this notice to Holmes, and Holmes & Galey.

6. In addition, in this correspondence, Altheimer & Gray also advised of two other potential claims against Holmes & Graven, which resulted from the firm's asserted failure to diligently represent the HRA's interests during the State Court Trial,

correspondence, Altheimer & Gray requested that Kennedy & Graven "provide a copy of this letter to the appropriate insurance carriers on a prompt and timely basis, as notice of the possible claims stated herein." *Id.* at page 5.

In response to this request, on November 1, 1995, Kennedy & Graven tendered Notice of the HRA claim to its insurance agent, and the agent forwarded that Notice to Virginia Surety. By letter dated November 7, 1995, Virginia Surety declined coverage of the claim. Following Virginia Surety's denial of coverage, Kennedy & Graven retendered the HRA's Notice of Claim to its insurance agent who, in turn, transmitted the Notice to National Union. As well, on or about November 9, 1995, Holmes provided notice of the HRA's claim to Holmes & Galey's insurance agent, and that agent tendered the Notice of Claim to American Home.

On April 29, 1996, the HRA commenced a State Court action against Holmes & Graven, and former Holmes & Graven attorneys, Holmes and Nelson, alleging claims of legal malpractice in connection with the Woodland Park Project. Shortly thereafter, National Union advised Kennedy & Graven of its election to pay Kennedy & Graven's costs, in defending the malpractice action, but subject to a reservation of rights. Similarly, American Home advised Holmes, and Holmes & Galey, of its election to pay Holmes' defense costs, but also subject to a reservation of rights.

On December 6, 1996, National Union commenced this proceeding, in which it seeks a declaration that its policy does not provide coverage for HRA's legal malpractice claim. Thereafter, on March 12, 1997, Virginia Surety filed its Answer and Counterclaim, in which it seeks a declaration that it has no duty to defend, or to indemnify, Holmes & Graven, Holmes, or Nelson, with respect to the HRA malpractice action. In addition, Virginia Surety seeks a declaration that National Union has a duty to defend and indemnify Holmes & Graven, Holmes, and Nelson, in the HRA suit, and that American Home owes a duty to defend, and to indemnify,

Holmes in the State Court action. Presently before the Court are the Motions for Summary Judgment of National Union and Virginia Surety—each of whom seeks to elude responsibility for the HRA's legal malpractice claims, while affixing that responsibility to the other.

### III. *Discussion*

A. *Standard of Review.* Summary Judgment is not an acceptable means for resolving triable issues, nor is it a disfavored procedural shortcut when there are no issues which require the unique proficiencies of a Jury in weighing the evidence and in rendering credibility determinations. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary Judgment is appropriate when we have viewed the facts, and the inferences drawn from those facts, in a light most favorable to the non-moving party, and find no triable issue, nor any genuine issue of material fact which would preclude the entry of Summary Judgment. *Lower Brule Sioux Tribe v. State of South Dakota,* 104 F.3d 1017, 1021 (8th Cir. 1997), cert. denied, —— U.S. ——, 118 S.Ct. 64, 139 L.Ed.2d 26 (1997); *Andrews v. Fowler,* 98 F.3d 1069, 1074 (8th Cir.1996); *Bank of America National v. Shirley,* 96 F.3d 1108, 1111 (8th Cir.1996); *Kiemele v. Soo Line Railroad Co.,* 93 F.3d 472, 474 (8th Cir.1996). For these purposes, a disputed fact is "material" if it must inevitably be resolved and the resolution will determine the outcome of the case, while a dispute is "genuine" if the evidence is such that a reasonable Jury could return a Verdict for the non-moving party. See, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Landon v. Northwest Airlines, Inc.,* 72 F.3d 620, 624 (8th Cir. 1995); *Churchill Business Credit Inc., v. Pacific Mutual Door Co.,* 49 F.3d 1334, 1336 (8th Cir.1995).

As Rule 56(e), *Federal Rules of Civil Procedure,* makes clear, a party is entitled to Summary Judgment where the non-moving party has failed "to establish the existence of an element essential to its case, and on which

---

and to submit a post-Trial Motion, to the Trial Court, for Amended Findings of Fact and Conclusions of Law. Neither of the parties premise

their dispositive Motions on these potential claims and, therefore, we do not consider them further.

it will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* supra at 322, 106 S.Ct. 2548; *St. Paul Fire & Marine Ins. Co. v. Federal Deposit Ins. Corp.,* 968 F.2d 695, 699 (8th Cir.1992). No genuine issue of fact exists in such a case because "a complete failure of proof concerning an essential element of [the Plaintiff's] case necessarily renders all other facts immaterial." *Id.,* at 323, 106 S.Ct. 2548; *Fischer v. NWA, Inc.,* 883 F.2d 594, 599 (8th Cir.1989), cert. denied, 495 U.S. 947, 110 S.Ct. 2205, 109 L.Ed.2d 531 (1990).

B. *Legal Analysis.* The question presented by the cross-Motions is simple to frame, for we are only required to determine which, if any, of the pertinent professional liability policies provides coverage for the HRA's legal malpractice claim. At the threshold of our analysis, we note that, notwithstanding the arguments of National Union, and of Virginia Surety, to the contrary, the distinct possibility exists that none of the policies provides coverage for the HRA's claim—a result would is not particularly unusual and, here, proves to be true. See, e.g., *United States v. A.C. Strip,* 868 F.2d 181 (6th Cir.1989) (neither of two claims made policies provided coverage to law firm or attorney); *Phoenix Insurance Company v. Sukut Construction Company, Inc.,* 136 Cal.App.3d 673, 676 n. 1, 186 Cal.Rptr. 513 (Cal.App.1982) ("We reject Sukut's contention that the resolution of these issues are necessarily related[;][a] lack of coverage by Phoenix does not require coverage by Mission; and vice versa," for "[e]ach insurance policy must be evaluated as if no other coverage existed."). Accordingly, our task is to individually examine the language of each policy, and to determine if coverage exists, under that policy, for the HRA's claim.

■ 1. *Standard of Review.* Under Minnesota law, it is settled that the interpretation of an insurance contract is a question of law. See, *Watson v. United Services Automobile Ass'n,* 566 N.W.2d 683, 688 (Minn. 1997); *Meister v. Western Nat. Mut. Ins. Co.,* 479 N.W.2d 372, 376 (Minn.1992); *Winthrop and Weinstine, P.A. v. Travelers Casualty and Surety Co.,* 993 F.Supp. 1248, 1254 (D.Minn.1998). As explained by the Minnesota Supreme Court, in *Jenoff, Inc. v. New Hampshire Ins. Co.,* 558 N.W.2d 260, 262 (Minn.1997):

In interpreting insurance contracts, we must ascertain and give effect to the intentions of the parties as reflected in the terms of the insuring contract. *Minnesota Mining & Mfg. Co. v. Travelers Indem. Co.,* 457 N.W.2d 175, 179 (Minn.1990), (citing *Dairyland Ins. Co. v. Implement Dealers Ins. Co.,* 294 Minn. 236, 244–45, 199 N.W.2d 806, 811 (1972)). "If the terms of an insurance policy are not specifically defined, they must be given their plain, ordinary, or popular meaning." *Smith v. St. Paul Fire & Marine Ins. Co.,* 353 N.W.2d 130, 132 (Minn.1984), (citing *Dairyland Ins.,* 294 Minn. at 244, 199 N.W.2d at 811). Ambiguous terms in an insurance contract are to be resolved against the insurer and in accordance with the reasonable expectations of the insured. *Columbia Heights Motors, Inc. v. Allstate Ins. Co.,* 275 N.W.2d 32, 36 (Minn.1979) (citations omitted). Ambiguity exists if the language of the policy is reasonably subject to more than one interpretation. Id. at 34. "However, a court has no right to read an ambiguity into the plain language of a policy in order to provide coverage." *Farkas v. Hartford Accident & Indem. Co.,* 285 Minn. 324, 327, 173 N.W.2d 21, 24 (1969) (citations omitted).

In sum, "[t]he insurance policy must be considered as a whole, according to the language used by the parties in their agreement." *Winthrop and Weinstine, P.A. v. Travelers Casualty and Surety Co.,* supra at 1254, citing *Henning Nelson Constr. Co. v. Fireman's Fund Am. Life Ins. Co.,* 383 N.W.2d 645, 652 (Minn.1986).

2. *Legal Analysis.* Applying these principles, our analysis commences with a consideration of the language in the Virginia Surety policy, since that was the policy that was in effect when the HRA first provided written Notice of its claim.

■ In pertinent part, the coverage language of the Virginia Surety policy reads as follows:

To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of any

act, error or omission of the insured in the rendering of or failure to render professional services for others, *provided always that:*

a. Claim is first made against the insured and reported to the company during the policy period or the extended reporting period, if purchased, by reason of such act, error or omission; and

b. *the insured, on the effective date of the policy, did not know or could not reasonably foresee that such act, error or omission might be the basis for a claim.*

*Exhibit M,* at page 10.

In urging that its policy does not provide coverage for the HRA's malpractice claim, Virginia Surety maintains that, before the effective date of the Virginia Surety policy, Kennedy & Graven could have reasonably foreseen the potential for a malpractice claim which would arise from the acts of Holmes & Graven, and its attorneys who were involved on behalf of the HRA, with respect to the HRA's Woodland Park complex.[7] We agree.

As we have already detailed, in its Findings of Fact and Conclusions of Law, the Trial Court, in the HRA–Trustee proceeding, was unsparingly critical of Holmes & Graven's legal representation of the HRA and, in particular, its criticism of Nelson's draftsmanship was especially pointed. Specifically, the Court determined that, when drafting the Trust Indenture, and related documents, Nelson used, as a model, forms which had been drafted, by a Texas law firm, that contained language with which Nelson was unfamiliar, and which were prepared for the issuance of conduit financing bonds, as opposed to nonessential governmental function bonds. As recounted by the Trial Court's Findings, "Nelson included the 'directly' language in Sections 5.11 and 5.12 of the Indenture be-

cause it was in the Butler & Binion model" and, "[w]hen Nelson incorporated the term 'directly' into Sections 5.11 and 5.12, he did not consider its meaning or effect." Lastly, because the term "directly," was incorporated, without change, in sections 5.11 and 5.12 of the Trust Indenture, the Trial Court concluded that "the HRA [was] personally responsible and thus personally liable" for obligations which, according to the HRA, would total over five million dollars in unanticipated expenditures. We cannot accept that, notwithstanding the condemnatory content of the Trial Court's Findings, Holmes & Graven, and the lawyers involved, were oblivious to the likely prospect that the HRA would seek to minimize their losses, occasioned by the negligence of its lawyers, through an action for malpractice.

When we consider that the Trial Court issued its Findings of Fact, Conclusions of Law, Order, and Order for Judgment, on June 6, 1995—that is, only about three months before Kennedy & Graven applied for the Virginia Surety policy—we can only conclude that it defies belief to suggest, as National Union has urged, that Kennedy & Graven could not have reasonably foreseen that Nelson's, and Holmes & Graven's clear drafting blunders "might be the basis for a [legal malpractice] claim." We have no basis in common sense to accept, as National Union implicitly contends, that the attorneys at Kennedy & Graven were effectively unconscious when they completed their application for insurance coverage with Virginia Surety, and failed to include notice of a potential claim by the HRA. Indeed, by this time, the HRA files were removed from Holmes & Graven, and its successor firm, and the HRA had retained malpractice counsel to evaluate the claim against the Holmes & Graven at-

---

7. We agree with Virginia Surety that an objective, and not a subjective, standard applies when determining whether Kennedy & Graven knew, or could have reasonably foreseen, that the pertinent acts, errors, or omissions, could provide the basis for a legal malpractice claim. See, e.g., *Mt. Airy Insurance Company v. Thomas,* 954 F.Supp. 1073, 1079 (W.D.Pa.1997), aff'd, 149 F.3d 1165 (3rd Cir.1998) (Table); *International Surplus Lines Ins. Co. v. University of Wyoming Research Corp.,* 850 F.Supp. 1509, 1521 n. 11 (D.Wyo.1994), aff'd, 52 F.3d 901 (10th Cir.1995); *International Ins. Co. v. Peabody Int'l Corp.,* 747 F.Supp. 477, 483 (N.D.Ill.1990); but see, *Estate of Logan v. Northwestern Nat. Casualty Co.,* 144 Wis.2d 318, 339–340, 424 N.W.2d 179, 186–87 (Wis.1988) (Court held that subjective standard applied where policy spoke of attorney's "basis to believe" whether he had committed a professional breach of duty). Here, the use of the "reasonably foresee" language, in the Virginia Surety policy, "clearly mandate[s] an objective inquiry." *International Surplus Lines Ins. Co. v. University of Wyoming Research Corp.,* supra at 1521 n. 11; see also, *International Ins. Co. v. Peabody Int'l Corp.,* supra at 483.

torneys. In our view, the inevitability of the HRA's claim can be likened to a loose button—the wearer knows the button will drop, but not just when.

 Further, we conclude that Kennedy & Graven possessed an independent duty to apprise Virginia Surety, before the issuance of its policy, of the potential for the HRA's malpractice claim, and that it failed to honor that duty. In its application for the Virginia Surety policy, Kennedy & Graven was specifically asked whether, "[a]fter inquiry[,] does the applicant or any lawyer in the firm know of any circumstances, acts, errors or omissions that could result in a professional liability claim against the applicant or any predecessor in business or any of the past or present lawyers in the firm?" *Exhibit L*, at page 5. If the answer to that question was "Yes," then the applicant was instructed to provide the "full details" of the "circumstances, acts, errors or omissions." In response to that inquiry, Kennedy & Graven replied affirmatively, and disclosed various acts which could give rise to other legal malpractice claims, but failed to disclose any of the "circumstances, acts, errors or omissions" which ultimately gave rise to the HRA's malpractice claim. In our considered view—inexorably driven by the Trial Court's Findings of Fact and Conclusions of Law of June 5, 1995—we find it inconceivable that, in September of 1995—"after inquiry"—neither Kennedy & Graven, nor any of its attorneys,[8] could have been unaware that the actions of Holmes & Graven, as they related to their neglect of the HRA's recourse obligations, could be expected to engender a

legal malpractice claim. Under these circumstances, Kennedy & Graven was required to disclose the facts and circumstances which surrounded the potential malpractice claim of the HRA. See, *Mt. Airy Insurance Company v. Thomas*, 954 F.Supp. 1073, 1078 (W.D.Pa. 1997), aff'd, 149 F.3d 1165 (3rd Cir.1998) (Table); *International Ins. Co. v. Peabody Int'l Corp.*, 747 F.Supp. 477, 483 (N.D.Ill. 1990).

Accordingly, we recommend that Virginia Surety's Motion for Summary Judgment be granted, insofar as it seeks a Declaration and Judgment that it has no duty to defend, or to indemnify, Holmes & Graven, Holmes, or Nelson, with respect to the HRA's State Court malpractice action.[9]

 For essentially the same reasons, we recommend that Virginia Surety's Summary Judgment Motion be denied, insofar as it seeks a Declaration, and Judgment, that American Home owes a duty to defend, or to indemnify, Holmes with respect to the HRA's malpractice claim. The American Home policy contains a substantially identical coverage exclusion as is embodied in the Virginia Surety policy—that is, it contains an exclusion for "any acts, errors, or omissions occurring prior to the [policy's] effective date," which Holmes & Galey, or any member thereof, "knew or could reasonably have foreseen * * * might be the basis of a claim or suit * * *." *Exhibit J*, at page 5.

In applying for the American Home policy on June 15, 1995—just nine days after the State Court issued its Order in the HRA–

---

8. Notably, both of the attorneys, who represented the HRA in the HRA–Trustee proceeding, remained with Kennedy & Graven, after Holmes left that firm to join Holmes & Galey. These attorneys litigated the precise basis for a future malpractice claim, and did so to no avail. While the attorneys need not ascribe to the legitimacy of any claim of negligence on Nelson's part, we find it inconceivable that they would not have considered, as litigators, the well-defined probability, if not the inevitability, that their firm would be sued for legal malpractice. This was not a circumstance where a latent defect in draftsmanship, of uncertain legal effect, laid in wait of discovery. The drafting errors were palpable, public, and accruing the potential for significant financial losses. We find it illogical, and wholly beyond belief, that experienced Trial practitioners could be, as National would have us

conclude, so blithely indifferent to their own potential to be held negligent, that they would overlook their opportunity, if not their obligation, to disclose such a potential claim to a present or future indemnitor.

9. In passing, National Union has argued that Virginia Surety is estopped from denying coverage for the HRA claim. Whatever the merits of this contention, National Union lacks the necessary standing to advance the argument in this Court since, under Minnesota law, "estoppel cannot be asserted by third parties who have no rights under an insurance contract." *Redeemer Covenant Church of Brooklyn Park v. Church of Mutual Insurance Co.*, 567 N.W.2d 71, 75 n. 5 (Minn.App.1997), (rev. denied Minn., October 2, 1997):

Trustee action—Holmes & Galey was asked, in one of the application's inquiries, whether "any proposed insured [was] aware of any circumstances which m[ight] result in any claim being made against any proposed insured?" In response to this inquiry, Holmes & Galey responded "No." However, for reasons we have already expressed with respect to Virginia Surety's policy, we conclude that Holmes reasonably should have foreseen the real probability of the HRA's malpractice action, prior to the June 16, 1995, which was the effective date of the American Home policy. In this respect, we note that the HRA was, by and large, Holmes' client, which is evidenced by the fact that, when Holmes left Holmes & Graven for Holmes & Galey, the HRA promptly retained Holmes & Galey as its general counsel. Accordingly, even if we were to assume that Holmes was not subjectively aware of the Trial Court's condemnatory Findings of Fact and Conclusions of Law, prior to the effective date of the American Home policy, nevertheless, as the primary counsel for the HRA, Holmes, on an objective basis, could have reasonably foreseen the potential for the HRA's malpractice claim.[10]

 What remains, then, is a determination of whether National Union's policy provides coverage for the HRA's malpractice claim. Upon a full consideration of the Record, we conclude that it does not, in part, for the same reasons which precluded coverage under the other policies. National Union's policy contained a Notice of Claims provision, which required the following:

Upon the insured's **becoming aware of any act, error or omission which could reasonably be expected to be the basis** of the claim or suit covered hereby, written notice shall be given by or on behalf of the insured to the Company or any of its authorized agents as soon as practicable **during the policy period or extended reporting period,** together with the fullest information obtainable. If claim is made or suit is brought against the insured, the insured shall immediately forward to the Company every demand, notice, summons or other process received by him or his representative.

[Emphasis added].

The National Union policy also required the insured—that is, Holmes & Graven and its successor firm—to report potential claims, as follows:

A claim is first made against the insured during the policy period or extended reporting period if:

(a) during the policy period or extended reporting period the **insured shall have knowledge or become aware of any act, error or omission which could reasonably be expected to give rise to a claim under this policy** and shall during the policy period or extended reporting period give written notice thereof to the Company in accordance with Condition IX.

[Emphasis added].

There is no dispute that Holmes & Graven never gave National Union Notice, written or otherwise, of the exposure it held for a malpractice claim by the HRA. Indeed, even though Kennedy & Graven—the successor to Holmes & Graven—applied with National Union for a succeeding year of liability coverage, its application did not disclose the potential for the HRA's claim.[11] Accordingly, we

---

10. Notwithstanding the closely paralleling provisions in the policies of Virginia Surety, and of American Home, National Union—which is affiliated with American Home—was unable to meaningfully explain, at the Hearing in this matter, why the failure of Holmes to notify American Home of the potential HRA claim was justifiable, but Kennedy & Graven's failure to provide that same information to Virginia Surety was not. While we understand the financial interests involved, the application of the law is not to be skewed, as National Union's approach appears to have been, by pecuniary self-interest.

11. Exhibit K, to the parties' Stipulated Facts, contains an incomplete copy of Kennedy & Graven's application to renew its policy with National Union. On page 5 of 10, in the application, Kennedy & Graven was to state whether "any proposed insured [was] aware of any circumstances which may result in any claim being made against any proposed insured and, if the answer was in the affirmative, then the particulars of that claim were to be fully particularized on page 9. The application attached to the Stipulated Facts, however, only contains the pages through page 8. We reasonably infer, however, that Kennedy & Graven did not disclose the HRA's claim in this application for, if it had, then National Union would have received timely notice of that claim, and the issues now presented would not be before us.

conclude, as we did under the closely paralleling obligations that Kennedy & Graven held as to Virginia Surety, that National Union had no obligation to defend, or to indemnify, the firm with respect to the HRA's lawsuit—the basis of which was intimately known to the Holmes & Graven and, later, to the Kennedy & Graven lawyers. To allow such coverage would fundamentally rewrite, and restructure, the policy that the attorneys, and their insurer, had negotiated. This we may not do. See, *Lott v. State Farm Fire & Casualty Co.*, 541 N.W.2d 304, 307 (Minn.1995); *Simon v. Milwaukee Automobile Mut. Insur. Co.*, 262 Minn. 378, 391, 115 N.W.2d 40, 49 (1962).

█ The more substantial question arises from Virginia Surety's argument that the Notice of the Trustee's claim was sufficient to forewarn National Union of the HRA's claim. We disagree for, under Minnesota law, we do not believe that Notice from one claimant constitutes Notice from all potential claimants. Virginia Surety has urged that the HRA's malpractice claim was "related" to the claim for which the Trustee provided Notice on June 30, 1995, and which was within the operative period of the National Union policy. Therefore, Virginia Surety contends, the HRA's claim must be considered as an integral part of the Trustee's timely claim. We are not so persuaded.

As pertinent, the coverage language of the National Union policy provides as follows:
> If a claim has been first made against the insured and reported to the Company during the policy period or extended reporting period, any claim which is subsequently reported to the Company **and which arises out of the same or related acts, errors or omissions as form the basis of the claim first made against the insured** shall be considered part of the claim which was first made against the insured and reported to the Company during the policy period or extended reporting period.

*Exhibit A,* at page 4 [emphasis added].
The issue presented, therefore, is whether the HRA malpractice claim "arises out of the same or related acts, errors or omissions" as gave rise to the Trustee's claim.

In support of its contention, that such a relationship exists between the two acts, Virginia Surety emphasizes that the claimed errors or omissions arose out of the same legal project, and pertained to documents which were all drafted by Holmes & Graven. According to Virginia Surety, the circumstances here mirror those confronting the Court, in *Gregory v. Home Insurance Co.,* 876 F.2d 602 (7th Cir.1989). While we do not disagree with Virginia Surety's characterization of the *Gregory* case—for, indeed, the facts there bear close parallels to those presented here—we conclude that the ruling, in *Gregory,* does not conform to Minnesota law.

In *Gregory,* the Court was called upon to determine whether the phrase "series of related acts" was ambiguous and, if not, whether an attorney's errors in advising on tax and security matters, in drafting a promissory note, a production service agreement, and an opinion letter, which embodied those advices, were so "related" as to constitute a single "claim" for purposes of determining the limits of the policy's coverage. The policy in question contained a limit of $500,000 for each claim, and an aggregate coverage limit of $1,000,000. Notwithstanding that the attorney's professional errors affected different claimants, the Court concluded that these different claims were related, and were subject to the $500,000 limit. In so concluding, the Court was obligated to apply the law of Indiana.

While of guidance, *Gregory* does not control our decision here, as the Minnesota Supreme Court implicitly rejected its reasoning in *American Commerce Insurance Brokers, Inc. v. Minnesota Mut. Fire and Cas. Co.,* 551 N.W.2d 224 (Minn.1996). Like *Gregory,* *American Commerce* did not involve a claims-made policy, but did involve the substantive meaning of the term "related," as contained in a policy which provided coverage for employee dishonesty. In *American Commerce,* the Court was asked to determine whether the phrase "series of related acts" was ambiguous and, if not, whether an employee's acts of embezzlement, using a variety of different means, constituted, one, two, seven, or 155 claims, in determining the operative limits of the policy's coverage. While considering the Court's reasoning in *Gregory,* the Court was not disposed to treat

all of the claims as so "related" as to constitute a single claim within the policy's single limit coverage. Indeed, if *Gregory* controlled, that would· have been the inexorable result, in *American Commerce.*

Rather, the Court rejected *Gregory* 's definition of the term "related" as encompassing any acts which "logically or causally" connected, and applied a definition which considered, in the context of dishonesty coverage, "whether the acts are connected by time, place, opportunity, pattern, and most importantly, method or modus operandi." *Id.* at 231. Since the employee, in *American Commerce,* employed one method to embezzle funds, and one method to take funds received by her employer from customers, the Court concluded that the two methods of dishonesty were not "related," and were not encompassed within a single occurrence for purposes of the policy's single limits coverage.

We agree with those Courts, including the Minnesota Supreme Court, which have concluded. that, while broad, the term "related" is neither ambiguous, nor is it all encompassing. As the Court explained, in *American Commerce:*

> The court noted that although "related" is a commonly used word with a broad meaning which encompasses a myriad of relationships, multiple or broad meanings do not necessarily create ambiguity. * * * The court determined that "related" encompasses both logical and causal connections. * * * However, the court cautioned that the word "related" does not encompass every conceivable logical relationship. A relationship between two claims might be "so attenuated or unusual that an objectively reasonable insured could not have expected that they would be treated as a single claim under the policy." * * * Under either the logical or causal connections "tests," the court concluded that the attorney's failure to file a complaint to foreclose a mechanic's lien and to serve a stop notice on construction project's construction lenders were related in multiple respects because they arose out of the same transaction, were committed by the same attorney, and resulted in the same injury.

*Id.* at 228, citing and quoting, *Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.,* 5 Cal.4th 854, 21 Cal.Rptr.2d 691, 855 P.2d 1263 (1993); see also, *Gregory v. Home Insurance Co.,* supra at 606 ("At some point, of course, a logical connection may be too tenuous reasonably to be called a relationship, and the rule of restrictive reading of broad language would come into play.").

Here, applying the more restrictive meaning of "related," which the Court enunciated in *American Commerce,* we are satisfied that the Trustee's claim is not "related" to the HRA's claim to the extent required under Minnesota law, so as to constitute a single claim.

The HRA claim involves the drafting of a Trust Indenture which failed—mercilessly— to include a non-recourse provision, as the HRA had demanded. The loss to the HRA, which arose from that drafting error is reputed to be in the millions of dollars. In contrast, the attorney error that the Trustee identified, was not in the drafting of any legal instrument, but in arguing, during the State Court Trial, in a manner that the Trustee felt was in conflict with the contents of the attorney's legal Opinion Letter. The damages arising from the Trustee's claim would not be as extensive as the damages claimed by the HRA, and would appear to be limited to the legal costs in obtaining a foreclosure on the subject properties—an eventuality that was presaged by the express caveat contained in the Opinion Letter of May 9, 1990.

While the claims bear certain commonalities—namely, that the underlying acts were those of Holmes & Graven's attorneys, and were committed in the context of a single commercial venture—they bear no commonality as to the results, or losses, which would be generated by their underlying mistakes, the means by which any such losses would be caused were different, and· the losses were not coterminous. By our reading, the Trustee did not assert that the Opinion Letter was in error but, rather, that the attorney argued, during the course of a Trial, in contradiction to the Trustee's reading of the Opinion Letter. On the other hand, the HRA's claimed error would have been readily apparent at the time that the Trust Indenture was drafted and, indeed, was the precipitating cause for the HRA's declaratory judgment action. Even if our reading of the Trustee's

claim were wrong, it is plainly evident that the errors claimed by the Trustee and the HRA are far more removed, in their relationship to each other, than the difference between the same employee embezzling funds, as opposed to taking money, from the same employer—acts which the Minnesota Supreme Court determined were not "related."

Obviously, *American Commerce* did not pertain to a Notice of Claim provision in a legal malpractice insurance policy, but we cannot overlook the obvious impact of *American Commerce* on the issues before us. The Court, in *American Commerce*, would reject any argument that the Trustee's claim, and that of the HRA, were so related as to be joined as a single claim for the purposes of the single limit coverage, since the *modus operandi* giving rise to the claims was tellingly different.[12] Accordingly, if we accepted Virginia Surety's construction, National Union would be faced with the palpably unreasonable result that the two claims would be joined, as one, for notification purposes, but would be treated as separate claims for purposes of the policies' coverage limits. We cannot condone such a divergence in the construction of a common term, in separate portions of the same insurance contract. See, *Winthrop and Weinstine, P.A. v. Travelers Casualty and Surety Co.*, supra at 1254 ("The insurance policy must be considered as a whole, according to the language used by the parties in their agreement.").

Moreover, our conclusion, that the claims are not related, gives meaning to all of the policy terms that the parties negotiated. If, as Virginia Surety urges, notice of one claim, in a complex legal transaction, were sufficient to provide notice as to all other potential claims—even as to injuries suffered by distinctly different claimants, and by distinctly different means—then there would be no

purpose in an insured ever purchasing "extended reporting period" coverage. Under such a construction, once any claimant, in a legal transaction, should file a claim, then all other potential claims would be noticed through the entire limitations period for legal malpractice actions, even though the insured purchased no more than a claims-made policy. For reasons expressed by the Court in *American Commerce*, such an interpretation "would allow a potentially unlimited windfall of recovery * * *." *American Commerce Insurance Brokers, Inc. v. Minnesota Mut, Fire and Cas. Co.*, supra at 230.

Lastly, the interpretation of the term "related," which we apply here, is consistent with the usage employed by the insured—Holmes & Graven, and its successor firm. In detailing, at National Union's request, the bases for the Trustee's claim against Holmes & Graven, the firm expressed its views, in a letter to National Union of August 9, 1995, concerning the substance of that claim, and disclosed nothing about the potential claim against it by the HRA. Indeed, the only reference to the firm's representation of the HRA was contained in the penultimate paragraph of the firm's letter, which stated as follows:

> For reasons **unrelated** to the instant claim, the HRA is now being represented by another law firm in the current litigation.

The "unrelated" reasons would appear to include the fact that, in July of 1995, the Fredrikson & Byron law firm was retained by the HRA to appeal of the State District Court's declaration, that the HRA had recourse exposure under the Trust Indenture, as well as the fact that Altheimer & Gray had been retained "with respect to possible claims against professionals involved in the

---

**12.** National Union's policy is substantially similar to the policy at issue in *American Commerce*, in that National Union's policy addressed its limit of liability as follows:

The limit of liability stated in the Declarations as applicable to "all claims arising out of the same, related or continuing professional services" is the limit of the Company's liability for all damages and claims expenses arising out of the same, related or continuing professional services without regard to the number of insureds, claims, demands, suits, proceedings, or

claimants. If additional claims are subsequently made and reported to the Company and arise out of the same or related professional services as a claim already made and reported to the Company, all such claims, whenever made, shall be considered first made and reported to the Company within the policy period or extended reporting period in which the earliest claim arising out of such professional services was first made and reported to the Company, and all such claims shall be subject to the one such limit of liability.

Woodland Park financings." See, *Supplement to Exhibits,* dated October 30, 1997, at p. 4; *Stipulated Facts,* at ¶ 17. In fully disclosing the particulars of a claim, which they regarded as being "related" to the Trustee's claim, we are confident that the attorneys at Holmes & Graven, and its successor firm, would have explained the potential claim of the HRA, which had been smoldering well before July of 1995, when malpractice attorneys were retained by the HRA to evaluate the bases for such a claim of negligence.

Accordingly, if we were to adopt Virginia Surety's construction of the term "related," we would not only do violence to the law of the State of Minnesota, but we would indirectly vest Holmes & Graven with notification rights, and attendant insurance coverage, as to a claim that the firm failed to directly disclose to National Union. We find nothing in the stipulated Record before us, or in the applicable law, which would allow such circuity through a substantial rewriting of National Union's insurance policy. As the Court explained, in *Winthrop and Weinstine, P.A. v. Travelers Casualty and Surety Co.,* supra at 1254:

> Because the notice requirement in a claims-made policy defines the scope of coverage, "a delay in notice beyond the policy period would alter a basic term of the insurance contract." * * * Claims-made policies "place special reliance on notice" which "is just as important to coverage as the requirement that the claim be asserted during the policy period." * * * Thus, if an insured fails to give notice within the policy period of a claims-made policy, the insured is barred from recovery. * * * "Notice in a 'claims made' policy provides the insurer with the knowledge that after a certain date the insurer is no longer liable under the policy and accordingly allows the insurer to more accurately fix its reserves for future liabilities and compute premiums with greater certainty.

[Citations omitted].

Were we to ascribe to Virginia Surety's construction of "related," the temporal scope of a claims-made policy would be coterminous with the applicable statute of limitations, for the underlying claim, a prospect which would clearly defeat the purpose of such a policy, by creating open-ended tail coverage, which would vitiate the principal distinction between a "claims-made" and an "occurrence" policy. *Id.* at 1255.

For these reasons, we recommend that National Union's Motion for Summary Judgment be granted, except insofar as it seeks a declaration that Virginia Surety's policy imposes a duty to defend, and indemnify, Kennedy & Graven, and Nelson, with respect to the HRA's malpractice action. As a consequence, a final Judgment should be entered in favor of both National Union and Virginia Surety and, there being no other claims to adjudicate, the file should be closed.

NOW, THEREFORE, It is—

RECOMMENDED:

1. That the Motion of Virginia Surety for Summary Judgment [Docket No. 32] be granted, except to the extent that Virginia Surety seeks a Declaration, and Judgment, that National Union, and American Home, have a duty to defend and indemnify Holmes & Graven, Holmes, and Nelson, with respect to the HRA's State Court malpractice action.

2. That the Motion of National Union for Summary Judgment [Docket No. 34] be granted, except to the extent that National Union seeks a Declaration, and Judgment, that Virginia Surety, has a duty to defendant and indemnify Holmes & Graven, Kennedy & Graven, Holmes and Nelson, with respect to the HRA's State Court malpractice action.

### NOTICE

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than July 7, 1998,** a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing,

then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than July 7, 1998,** unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. § 636 to review the transcript in order to resolve all of the objections made.