Robert GREGORY, on behalf of himself and all others similarly situated, Plaintiff–Appellant,

v.

The HOME INSURANCE COMPANY, Defendant–Appellee.

No. 88–2172.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 30, 1988.

Decided June 12, 1989.

Irwin B. Levin, Cohen & Malad, Richard N. Bell, David J. Cutshaw, Indianapolis, Ind., for plaintiff-appellant.

G. Ronald Heath, Johnson, Smith, Densborn, Wright & Heath, Indianapolis, Ind., for defendant-appellee.

Before WOOD, Jr., and EASTERBROOK, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

FAIRCHILD, Senior Circuit Judge.

This is an action for declaratory judgment to determine the application of the policy limits of a Lawyers Professional Liability Insurance Policy. The action was brought against Home Insurance Company in order to implement an agreed settlement of an underlying class action.[1] The relevant facts, taken largely from Judge Dillin's opinion accompanying his order granting summary judgment, are not disputed.

The underlying class action arose out of a 1980 offering for sale by Producer's Brokerage Company (PBC) (the client of Home Insurance's insured) of episodes in a videotape series entitled "Fabulous Follies." PBC acted as broker of the videotapes. The videotapes were sold individually to investors, most of whom, at the time of sale, also signed a promissory note and a production service agreement authorizing PBC to market the purchased videotape on

---

1. Jurisdiction is founded on diversity. The district court held that the appropriate substantive law is New Jersey's, but the court and the parties appear to have agreed that, because there are no substantial differences, Indiana law would apply instead.

behalf of the buyer. The success of PBC's videotape investment program depended upon these production service agreements, since PBC hoped to market the videotapes collectively as a series to cable and television stations. The videotape sale, promissory note and production service agreement were intended to form an investment "package."

PBC hired Steven Gilbert, a partner in the New Jersey law firm of Gilbert, Gilbert, & Schlossberg (GG & S), to provide legal services in connection with the videotape investment program. Mr. Gilbert drafted for PBC the production service agreement and promissory note to be signed by each videotape buyer at the time of purchase. He also drafted a tax and security opinion letter for PBC concerning the videotape sales. The letter advised that the videotapes were not securities (and thus didn't need to be registered with the Securities Exchange Commission), and that buying the videotapes would give the buyers certain tax advantages. The opinion letter was reprinted in a sales brochure PBC distributed to prospective buyers.

The Internal Revenue Service disagreed with Mr. Gilbert's tax opinion, and disallowed the income tax deductions claimed by the buyers of the videotapes, and assessed interest and penalties against them. The plaintiff, Robert Gregory, on behalf of himself and others who bought "Fabulous Follies" episodes from PBC, brought a lawsuit (later certified as a class action) in the Southern District of Indiana against PBC, GG & S, and others, alleging violations of the federal securities laws and the Racketeer Influenced Corrupt Organization Act (RICO), and common law fraud. PBC cross-claimed against the insured, GG & S, alleging negligence in the preparation of the opinion letter. GG & S counterclaimed against its client, PBC, claiming fraud.

Adding to PBC and GG & S's troubles, the district court held that the videotape sales were "investment contracts" which

required registration with the SEC under the Federal Securities Act of 1933, and that they did not qualify for a private offering exemption. The court also ruled that GG & S had violated Section 10(b) of the Securities Exchange Act of 1934, and SEC Rule 10b–5. Shortly after the court's ruling, the parties and Home Insurance, GG & S's professional liability insurance carrier, reached a settlement, which the district court approved.[2]

The settlement agreement provided that Home Insurance would pay $500,000 in escrow on behalf of GG & S for the benefit of the class. The agreement recognized the right of Mr. Gregory, on behalf of the class, to bring a declaratory judgment action to determine the limit of liability under the policy "in light of the theories asserted by the *Gregory* class and the theories asserted by PBC in its cross-claim." According to the agreement, if the declaratory judgment action were to determine that the $500,000 per claim limit applied, Home Insurance would have no further liability. If the $1,000,000 limit were found to be applicable, Home Insurance would be liable for additional amounts, up to an additional $500,000. Mr. Gregory brought the action, and the district court determined that the $500,000 per claim limit applies. Mr. Gregory appeals.

## I. IS THE INSURANCE POLICY AMBIGUOUS?

The policy's Declaration Page indicates a limit of liability of $500,000 for "Each Claim" and $1,000,000 "Aggregate." The "Coverage" section has the following paragraph:

Claim, whenever used in this policy, means a demand received by the insured for money or services including the service of suit or institution of arbitration proceedings against the insured.

The "Limits of Liability" section contains this paragraph:

2. The parties settled before any judgment was entered, and defendants denied liability in the settlement agreement. We are not reviewing the correctness of the district court's liability determinations, and only address the question of the applicability of the insurance policy limits.

**IV. Multiple Insureds, Claims and Claimants:** The inclusion herein of more than one insured or the making of claims or the bringing of suits by more than one person or organization shall not operate to increase the Company's limit of liability. *Two or more claims arising out of a single act, error, omission or personal injury or a series of related acts, errors, omissions or personal injuries shall be treated as a single claim.* All such claims, whenever made, shall be considered first made during the policy period or Optional Extension period in which the earliest claim arising out of such act, error, omission or personal injury, was first made, and all such claims shall be subject to the same limits of liability.

(Emphasis added.)

According to Indiana law,

"[a]mbiguity in an insurance contract exists when [the contract] is susceptible to more than one interpretation and reasonably intelligent [persons] would honestly differ as to its meaning. An ambiguity does not exist simply because a controversy exists between the parties, each favoring an interpretation contrary to the other's. If the court does not find ambiguity in the language of the contract, it will be given its plain and ordinary meaning.

*Anderson v. State Farm Mut. Auto. Ins. Co.,* 471 N.E.2d 1170, 1172 (Ind.App. 3 Dist.1984) (citations omitted). Mr. Gregory asserts, in substance, that the two paragraphs from the policy quoted above create a "glaring ambiguity" because the word "claim" is defined in the policy as "a demand received by the insured for money or services," yet for purposes of determining the "each claim" policy limit, the word claim can mean several claims. We find no merit in this argument. Mr. Gregory's as-

sertion that Paragraph IV, quoted above, "redefines" the term "claim" so as to conflict with the first quoted paragraph's definition, is not a reasonable interpretation of the policy. Paragraph IV deals with two subjects: the limit of liability for certain described groups of claims, and how to determine when such groups of claims are considered "first made" under the policy. For the purpose of applying policy limits, Paragraph IV determines that a group of claims, as defined, "shall be treated as a single claim." We find clarity rather than ambiguity.

We find no ambiguity, either, in the policy's use of the word "aggregate." The policy does not define "aggregate," but states in the "Limits of Liability" section that "the liability of the Company shall not exceed the amount stated in the Declarations as Aggregate as a result of all claims first made against the insured...." (Emphasis omitted.) This sentence simply limits Home Insurance's liability as a result of all claims made during the policy period.[3]

## II. WERE THE CLAIMS "RELATED"?

Various claims were made against the insured, GG & S, concerning the videotape offering. The purchasers' claims (originally filed separately but later consolidated into a class) alleged that GG & S committed securities fraud, common law fraud, and RICO violations. These claims were based upon the opinion letter's alleged misstatements of the tax consequences of buying the videotapes. PBC's cross-claim alleged that if the allegations made in claims brought against PBC were true—that the videotapes were in fact securities, and that the tax benefits advertised in the opinion letter were not available to the videotape buyers—GG & S was negligent in the preparation of the opinion letter.

**3.** Mr. Gregory's attempt to construct an ambiguity by misapplying language from *Anchor Casualty Co. v. McCaleb,* 178 F.2d 322 (5th Cir. 1949) is unpersuasive. The court in *Anchor Casualty Co.,* did not, as Mr. Gregory claims, *define* the term "aggregate," but simply held that an insurance company was liable for its "aggregate" rather than "each accident" limit of coverage when a single oil well's blowout caused

damage to property of several persons. That case is but one of many deciding whether single causes which produce multiple injuries should be considered as single or multiple accidents or occurrences under an insurance policy which lacks a specific clause dealing with the problem. *See* Annotation, 64 A.L.R. 4th 668 (1988). Since Home Insurance's policy has such a clause, *Anchor Casualty Co.* has no bearing on this case.

■ The district court first held that the individual claims of the members of the class constituted a single claim under the clause that "[t]wo or more claims arising out of a single act, error, [or] omission ... shall be treated as a single claim." It is unclear whether Mr. Gregory objects to this conclusion, but since the individual buyers' claims all arose from the same conduct of Mr. Gilbert, the district court was undoubtedly correct.

■ It is easy to decide that all the class claims arising from Mr. Gilbert's mistaken advice on the investment program's tax advantages are treated as a single claim under Paragraph IV of the policy, and therefore are subject to the $500,000 limit; the more substantial question is whether the class claims *and the PBC claim* (which arose out of Mr. Gilbert's error with respect to the status of the videotape promotion as a security as well as his error concerning tax advantages) are to be treated as a single claim, so that the $500,000 limit is applicable to all.

The district court noted that a policy is not made ambiguous simply because the parties disagree on how it applies to a given situation. It found the policy language to be unambiguous, and that it should be given its "plain and ordinary meaning." Judge Dillin went on:

> Examining the three documents drafted by Gilbert in connection with the 1980 PBC offering—the tax and security opinion letter, the promissory note, and the production service agreement, the Court finds there is no question that these documents and Gilbert's acts in drafting them are "related." The opinion letter repeatedly refers to the other two documents, and it is clear the three are interdependent components of a single plan. Moreover, the Court finds that Gilbert's advising PBC of the tax and security law consequences of its offering, specifically his alleged failure to tell PBC that its offering was a security and should be registered, was also a related act, by any plain and ordinary meaning of "related." Gilbert's opinion letter is but a written version of his advice that,

structured this way, the offering was not a security.

The District Court considered the principal case relied on by Mr. Gregory, *Arizona Property & Casualty Ins. Guar. Fund v. Helme*, 153 Ariz. 129, 735 P.2d 451 (1987), where the Arizona Supreme Court construed the phrase "series of related incidents, acts or omissions" in a professional liability insurance policy. The court in *Helme* referred to a dictionary definition of "related" which defined the word as meaning either causally or logically connected. The court considered the "logical connection" portion of the definition to be too subjective, and limited the definition to causal connections only. It went on to hold that because there was no causal connection between the negligent acts of two physicians who examined the plaintiff (in the sense that one error did not cause the other), the plaintiff's claims against each physician did not arise out of a series of related acts under the multiple claims provision of the policy. 153 Ariz. at 134–35, 735 P.2d at 456–58. Judge Dillin held that in this case, unlike *Helme*, the acts giving rise to the claims could be considered causally connected, since they were performed by a single individual, Mr. Gilbert, and involved legal advice and drafting of three documents all of which "flowed from his structuring the deal to try to achieve certain tax and security consequences." Since the district court found the underlying acts to be related, it held that the policy limitation on multiple claims applied, and that Home Insurance's liability was limited to the "per claim" amount of $500,000.

Our reading of *Helme* convinces us that the Arizona Supreme Court intended "causally connected" to have a more narrow meaning than did Judge Dillin; it appears *Helme* requires a causal connection in the sense that one error caused the other, not that the opportunity to commit the errors arose out of the same cause. Nevertheless, we agree with Judge Dillin's conclusion that the different aspects of Mr. Gilbert's work in the videotape offering (the tax and securities advice he gave to PBC, and his drafting of the promissory note,

production service agreement and opinion letter embodying that advice) were all "related" in any meaningful sense of the term.[4]

We agree with the *Helme* court that the common understanding of the word "related" covers a very broad range of connections, both causal and logical.[5] However, we don't think the rule requiring insurance policies to be construed against the party who chose the language[6] requires such a drastic restriction of the natural scope of the definition of the word "related." Parties are generally free to include language of their choice in contracts, and courts should refrain from rewriting them. *E.g., Evans v. National Life Accident Ins. Co.,* 467 N.E.2d 1216, 1219 (Ind.App.1984). At some point, of course, a logical connection may be too tenuous reasonably to be called a relationship, and the rule of restrictive reading of broad language would come into play. The facts of this case, though, as concisely explained by Judge Dillin, comfortably fit within the commonly accepted definition of the concept.

The district court was correct in deciding that under Home Insurance's insurance policy the claim of Producer's Brokerage Co., Inc. was required to be treated in combination with the claims of the Gregory class as a single claim. Accordingly, the $500,000 per claim limit of liability applies

for the purpose of the Settlement Agreement between the parties. The judgment of the district court is AFFIRMED.

---

4. Home Insurance has not attempted to characterize the claims against GG & S as arising out of the *same* act—the issuance of the tax and securities opinion letter. Instead, the parties seem to agree that the claims arise out of events more or less distinct, the issue being whether these events are properly considered "related." Similarly, the parties do not argue whether the underlying "acts, errors [or] omissions" are properly considered a "series." The inclusion of this term could require a temporal connection (which seems to be met here in any case) within the conduct giving rise to the different claims. See Webster's Third New International Dictionary (1981) 2073 ("series" defined as "a group of usu[ally] three or more things or events standing or succeeding in order and having a like relationship to each other: a spatial or temporal succession of persons or things: a group that has or admits an order of arrangement exhibiting progression."

5. According to Black's Law Dictionary, (5th Ed. 1979), the word means "[s]tanding in relation,

connected; allied; akin." Webster's Third New International Dictionary (1981) defines "related" as "having relationship: connected by reason of an established or discoverable relation." and defines "relation" as "an aspect or quality (as resemblance, direction, difference) that can be predicated only of two or more things taken together: something perceived or discovered by observing or thinking about two or more things at the same time: connection."

6. Ambiguities are construed against the party who wrote the contract. *Montgomery v. Farmers Ins. Group,* 585 F.Supp. 618, 619 (S.D.Ind. 1984); *Traveler's Indemnity Co. v. Armstrong,* 384 N.E.2d 607, 618 (Ind.App.1979), *mod. on other grounds,* 442 N.E.2d 349 (Ind.1982). Indiana law also requires narrow construction of exclusions or conditions which act to defeat coverage under insurance policies. See *Huntington Mutual Insurance Co. v. Walker,* 181 Ind. App. 618, 392 N.E.2d 1182, 1185 (1979); *Asbury v. Indiana Union Mutual Ins. Co.,* 441 N.E.2d 232, 242 (Ind.App.1982).