

FILED

Jul 15 2020, 8:35 am

C L E R K
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

George M. Plews
Sean M. Hirschten
Plews Shadley Racher & Braun, LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES

Stephen J. Peters
David I. Rubin
Kroger Gardis & Regas, LLP
Indianapolis, Indiana

Marianne G. May
Daren S. McNally
Florham Park, New Jersey

Sydney L. Steele
Kroger Gardis & Regas, LLP
Indianapolis, Indiana

David T. Brown
Chicago, Illinois

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| National Collegiate Athletic Association,<br>*Appellant-Plaintiff,*<br><br>v.<br><br>Ace American Insurance, *et al.,*<br>*Appellees-Defendants.* | July 15, 2020<br><br>Court of Appeals Case No.<br>19A-PL-1313<br><br>Appeal from the Marion Superior<br>Court<br><br>The Honorable David J. Dreyer,<br>Judge<br><br>Trial Court Cause No.<br>49D10-1601-PL-1570 |

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Plaintiff, National Collegiate Athletic Association (NCAA), appeals the trial court's summary judgment in favor of Appellees-Defendants, Federal Insurance Company (FIC), Illinois National Insurance Company (Illinois National), and Westchester Fire Insurance Company (Westchester) (collectively, Insurers), concluding that, as a matter of law, Insurers are not required to provide coverage for the underlying lawsuit filed against the NCAA.[1]

We affirm.

# ISSUE

The NCAA presents one issue on appeal, which we restate as: Whether no genuine issue of material fact exists that the Related Wrongful Acts Exclusion in the NCAA insurance policies bars coverage for the NCAA in the *Jenkins* lawsuit.

# FACTS AND PROCEDURAL HISTORY

The NCAA is an unincorporated association of American colleges and universities, with the basic purpose to "maintain intercollegiate athletics as an integral part of the educational program and the athlete as an integral part of

---

[1] We conducted a virtual oral argument in this cause on June 9, 2020. We thank counsel for their excellent advocacy and presentation.

the student body and by so doing, retain a clear line of demarcation between intercollegiate sports and professional sports." (Appellant's App. Vol IV, p. 17). To achieve this purpose, the NCAA promulgates rules governing the financial aid its member universities and colleges may offer student-athletes.

## I. *The Underlying Actions*

The NCAA's rules governing what its member institutions may offer student-athletes have changed since 2006, when a class action complaint in *White v. Nat'l Collegiate Athletic Ass'n*, Case No. CV06-0999 (C.D. Cal.) was settled in California. Prior to *White*, student-athlete scholarships, or grants-in-aid, covered only tuition and fees, room and board, and required books. However, this grant-in-aid was less than the actual cost of attendance. The total cost of attendance includes all grant-in-aid items, in addition to "supplies, transportation, and other expenses related to attendance at the institution." (Appellant's App. Vol IV, p. 214). Pursuant to NCAA's rules in 2006, student-athletes could receive financial aid that covered the entire cost of attendance, but the component of that scholarship that was paid in excess of the grant-in-aid could not be based primarily on the student-athlete's participation in athletics. Nevertheless, member institutions could not offer student-athletes health insurance or accident insurance and grants-in-aid could only be offered for a single year.

The *White* complaint, in its second amended version, alleged:

While Major College Football and Major College Basketball have become a huge commercial enterprise generating billions in annual revenues, the NCAA and its member institutions do not allow student-athletes the share of the revenues that they would obtain in a more competitive market. Through an unlawful horizontal agreement, the NCAA and its member institutions have agreed to deny a legitimate share of the tremendous benefits of their enterprise to the student-athletes that made the big business of full-time college sports possible. Under their longstanding express agreement, the NCAA and its member institutions have short-changed student-athletes by imposing an artificial cap on the amount of financial aid any student-athlete may receive in the form of an athletic scholarship, or grant-in-aid. The artificial cap on financial aid is set below the full amount of the full cost of attendance that any student would incur to attend the relevant colleges and universities.

(Appellant's App. Vol. III, pp. 60-61). The *White* plaintiffs' antitrust theory advocated that without the NCAA's grant-in-aid rules in place at the time, "[s]chools competing against one another to attract student-athletes in the relevant markets for Major College Football and Major College Basketball would increase the amount of financial aid available so that full athletic scholarships would, in fact, cover the full [cost of attendance]." (Appellant's App. Vol. III, p. 61). As relief, the *White* plaintiffs sought the elimination of the artificial grant-in-aid cap and damages based on the athletics-based financial aid payments covering the full cost of attendance. They also requested the *White* court for an injunction restraining the NCAA from enforcing its unlawful and anticompetitive agreements to cap the amount of financial aid available to student-athletes at an amount that does not cover the full cost of attendance. While the NCAA was the only defendant in this matter, the plaintiff class was

limited to male college football and basketball players who received athletic-based grants-in-aid at any time between February 17, 2002 and the "date of judgment in this matter." (Appellant's App. Vol. III, p. 66). *White* settled in 2008, with final judgment entered on August 5, 2008.

[7] In conjunction with and after the *White* settlement, the NCAA made changes to the benefits system that member institutions could offer student-athletes. As a result, the cost of attendance gap between the value of a scholarship and the actual cost of attending the institution decreased after 2006. Furthermore, the NCAA and its member institutions created a $218 million Student-Athlete Opportunity Fund accessible to student-athletes with financial need which allowed schools to provide varying degrees of benefits to student-athletes tied to the student-athlete's education or to the cost of attending the institution. The NCAA also amended various rules to allow schools to offer additional benefits such as health and accident insurance and to offer scholarships that are guaranteed regardless of whether the student-athlete competes for the entirety of the period of the financial aid award.

[8] On March 17, 2014, another class action complaint, *Jenkins et al. v. Nat'l Collegiate Athletic Assoc.*, was filed. The second amended complaint, filed on February 13, 2015, in the United States District Court for the Northern District of California, alleged

> The Defendants in this action—the [NCAA] and five major
> NCAA conferences that had agreed to apply NCAA restrictions
> []—earn billions of dollars in revenues each year through the

hard work, sweat and sometimes broken bodies of top-tier college football and men's basketball athletes who perform services for Defendants' member institutions in the big business of college sports. However, instead of allowing their member institutions to compete for the services of those players while operating their businesses, Defendants have entered into what amounts to cartel agreements with the avowed purpose and effect of placing a ceiling on the compensation that may be paid to those players for their services. Those restrictions are pernicious, a blatant violation of the antitrust laws, have no legitimate pro-competitive justification, and should now be struck down and enjoined.

(Appellant's App. Vol. III, p. 116). Through its lawsuit, the *Jenkins* plaintiffs sought to enjoin the NCAA and the other defendants from imposing any restrictions on the amount of money or other benefits that may be offered to student-athletes by the schools or anyone else. While *White* challenged NCAA Bylaws 15.02.5, 15.02.2, and 15.1, which capped a grant-in-aid below the cost of attendance, *Jenkins* contested, as illegal under the Sherman Act, all NCAA rules that prohibit, cap, or otherwise limit the remuneration that players may receive for their athletic services, including but not limited to NCAA Bylaws 12 (amateurism; prohibiting boosters, etc.), 13 (recruiting), 15, and 16.

[9] The *Jenkins* action was filed on behalf of two classes consisting of Division I Football Bowl Subdivision football players and men's Division I basketball players who, from the date of the *Jenkins* complaint through final judgment in *Jenkins* have received or will receive a full grant-in-aid scholarship or a written offer for a grant-in-aid scholarship. The *Jenkins* time period does not overlap with the *White* time period. Unlike *White*, *Jenkins'* declaratory and injunctive

relief sought to enjoin the NCAA and the other defendants from imposing any restrictions on what money or other benefits could be offered to student-athletes.

## II. *Insurance Coverage*

### A. The 2005-2006 Policies – (effective during the *White* litigation)

The NCAA purchased a primary insurance policy issued by National Union Fire Insurance Company (National Fire) (2005-2006 Primary Policy) and two excess policies for the period of September 30, 2005 to September 30, 2006. One of the excess policies is a follow form policy, indicating that its coverage generally applies according to the same terms and conditions as the 2005-2006 Primary Policy after the 2005-2006 Primary Policy is exhausted.

Coverage under the 2005-2006 Primary Policy was limited to Claims "first made" and reported during the policy period: "This policy shall pay on behalf of the [NCAA] Loss arising from a Claim first made against the [NCAA] during the Policy Period . . . reported to the Insurer . . . for any actual or alleged Wrongful Act of the [NCAA][.]" (Appellees' App. Vol. III, p. 25). However, Section 7(b) of the Primary Policy states:

> If a written notice of Claim has been given to the Insurer
> pursuant to Clause 7(a) above, then any Claim which is
> subsequently made against the Insureds and reported to the
> Insurer alleging, arising out of, based upon or attributable to the
> facts alleged in the Claim for which such notice has been given,
> or alleging any Wrongful Act which is the same as or related to
> any Wrongful Act alleged in the Claim of which such notice has

been given, shall be considered made at the time such notice was given.

(Appellees' App. Vol. III, p. 36).

[12] 'Claim' is defined as "A written demand for monetary relief; or . . . a civil, criminal, regulatory or administrative proceeding for monetary or non-monetary relief[.]" (Appellees' App. Vol. III, p. 29). The 2005-2006 Primary Policy defines Wrongful Act, in relevant part, as "any breach of duty, neglect, error, misstatement, misleading statement, omission or act by or on behalf of the [NCAA]." (Appellees' App. Vol. III, p. 32). The definition also "specifically include[s] . . . violation of the Sherman Antitrust Act or similar federal, state or local statutes or rules[.]" (Appellees' App. Vol. III, p. 33). The 2005-2006 Primary Policy notes that "any Claim which is made subsequent to the Policy Year . . . which, pursuant to Clause 7(b) . . . is considered made during the Policy Year . . . shall also be subject to the one applicable aggregate Limit of Liability[.]" (Appellees App. Vol. III, p. 35).

B. The 2012-2014 Policies - (effective at the commencement of *Jenkins*)

[13] XL Specialty Insurance Company (XL)[2] issued a primary policy to NCAA for the period of September 30, 2012 to September 30, 2014 for an amount of $20 million (2012-2014 Primary Policy). Excess policies, which are follow form

---

[2] XL settled with NCAA in 2018.

policies to XL's primary policy, were issued by FIC (for an amount of $10 million in excess of $20 million), by Illinois National (for an amount of 10 million in excess of $30 million), and by Westchester (for an amount of $5 million in excess of $40 million) (collectively, 2012-2014 Excess Policies).

The "Insuring Agreement" under Coverage C of the 2012-2014 Primary Policy notes that

> This policy shall pay on behalf of the [NCAA] Loss arising from a Claim first made against the [NCAA] during the Policy Period . . . reported to the Insurer . . . for any actual or alleged Wrongful Act of the [NCAA]

(Appellant's App. Vol. II, p. 192). The 2012-2014 Primary Policy defines Wrongful Acts as "any actual or alleged: act, error, omission, misstatement, misleading statement, neglect or breach of duty for: . . . (b) violation of the Sherman Antitrust Act or similar federal, state or local statutes or rule[.]" (Appellant's App. Vol. II, pp. 195-96).

*Jenkins* is a Claim made against the NCAA during the 2012-2014 Primary Policy period. The NCAA timely reported *Jenkins* to the Insurers pursuant to the respective policy terms. Nevertheless, the 2012-2014 Primary Policy includes a Related Wrongful Acts Exclusion, which provides as follows:

> IV. Exclusions
>
> The Insurer shall not be liable to make any payment for Loss in connection with a Claim made against the Insured:

* * *

C. alleging, arising out of, based upon or attributable to the facts alleged, or to the same or Related Wrongful Act alleged or contained, in any Claim which has been reported, or in any circumstance of which notice has been given before the inception date of this policy, under any other management liability insurance policy, directors and officers liability insurance policy or any similar insurance policy of which this policy is a renewal or replacement or which it may succeed in time[.]

(Appellant's App. Vol. II, p. 197). The 2012-2014 Primary Policies define "Related Wrongful Act" as:

Wrongful Acts which are the same, related or continuous, or Wrongful Acts which arise from a common nucleus of facts. Claims can allege Related Wrongful Acts regardless of whether such Claims involve the same or different claimants, Insureds or legal causes of action.

(Appellant's App. Vol. II, p. 194). The 2012-2014 Primary Policy also contains a notice provision which does not exclude coverage but aligns notice as to an initial and any subsequent "same or . . . related" Wrongful Act:

VII. Notice/Claim Reporting Provision

Notice hereunder shall be given in writing to the Insurer . . .

B. If written notice of a Claim has been given to the Insurer pursuant to Clause VII A above, then any Claim which is subsequently made against the Insureds and reported to the Insurer alleging, arising out of, based upon or attributable to the facts alleged in the Claim for which such notice has been given,

or alleging a Wrongful Act which is the same as or related to any Wrongful Act alleged in the Claim of which such notice has been given, shall be considered made at the time such notice was given.

(Appellant's App. Vol. II, p. 200).

[16] By letter dated April 11, 2014, XL denied coverage for *Jenkins* under the 2012-2014 Primary Policy, finding upon review of NCAA's claim that the "*Jenkins* [a]ction involves the same Wrongful Acts and/or Related Wrongful Acts as those at issue in the *White* [a]ction." (Appellant's App. Vol. II, p. 168). Both "suits challenge the limitation on the amount of [grant-in-aid] provided to Division I men's football and/or basketball players which is less than the full cost of attendance, and assert that the NCAA unlawfully has agreed with other entities to cap the financial aid provided to student-athletes. . . . The [two] actions therefore involved the same, related or continuous Wrongful Acts and/or Wrongful Acts which arise from a common nucleus of facts." (Appellant's App. Vol. II, p. 168). Accordingly, as *Jenkins* was deemed to have been first made in February 2006 when *White* was filed, XL precluded coverage under the 2012-2014 Primary Policy. The insurers of the excess policies equally relied on XL's denial of coverage to bar coverage under the 2012-2014 Excess Policies.

[17] On January 14, 2016, NCAA filed its Complaint for declaratory judgment and damages against XL and Insurers. On April 31, 2017, NCAA was granted leave to amend its Complaint by adding ACE American Insurance Company

(ACE), North American Specialty Insurance Company (NAS), Starr Indemnity & Liability Company (Starr), and U.S. Specialty Insurance Company (U.S. Specialty) (collectively, New Defendants) as additional Defendants. The parties subsequently filed and briefed cross-motions for partial summary judgment on NCAA's claim for insurance coverage, together with supporting evidentiary designations. Following a settlement with the NCAA, XL was dismissed from this action.

On June 1, 2019, after a hearing, the trial court entered its partial summary judgment in favor of Insurers, finding

> The NCAA repeatedly draws overly fine distinctions regarding the related actions and deconstructs the language about different class action definitions and causes of actions, etc. The [c]ourt finds these analyses unavailing. The Related Wrongful Acts and prior notice provisions are unambiguous, the underlying claims are clearly all against one wrongful act, that is, the enforcement of Bylaws 15 and 16, first made in the White action, and coverage is barred under the policies.

(Appellant's App. Vol. II, p. 61). On July 1, 2019, the trial court amended its Order.

The NCAA appealed. Following the NCAA's appeal, the New Defendants were dismissed from this action. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Standard of Review*

[20]     In reviewing a trial court's ruling on summary judgment, this court stands in the shoes of the trial court, applying the same standards in deciding whether to affirm or reverse summary judgment. *First Farmers Bank & Trust Co. v. Whorley*, 891 N.E.2d 604, 607 (Ind. Ct. App. 2008), *trans. denied*. Thus, on appeal, we must determine whether there is a genuine issue of material fact and whether the trial court has correctly applied the law. *Id*. at 607-08. In doing so, we consider all of the designated evidence in the light most favorable to the non-moving party. *Id*. at 608. A fact is 'material' for summary judgment purposes if it helps to prove or disprove an essential element of the plaintiff's cause of action; a factual issue is 'genuine' if the trier of fact is required to resolve an opposing party's different version of the underlying facts. *Ind. Farmers Mut. Ins. Group v. Blaskie*, 727 N.E.2d 13, 15 (Ind. 2000). The party appealing the grant of summary judgment has the burden of persuading this court that the trial court's ruling was improper. *First Farmers Bank & Trust Co.*, 891 N.E.2d at 607.

[21]     We observe that, in the present case, the trial court entered findings of fact and conclusions of law thereon in support of its judgment. Generally, special findings are not required in summary judgment proceedings and are not binding on appeal. *AutoXchange.com. Inc. v. Dreyer and Reinbold, Inc.*, 816 N.E.2d 40, 48 (Ind. Ct. App. 2004). However, such findings offer a court valuable insight into the trial court's rationale and facilitate appellate review. *Id.*

## II. *Analysis*

[22] Interpretation of an insurance policy presents a question of law that is particularly suited for summary judgment. *State Auto Mut. Ins. Co. v. Flexdar*, 964 N.E.2d 845, 848 (Ind. 2012). "It is well settled that where there is ambiguity, insurance policies are to be construed strictly against the insurer and the policy language is viewed from the standpoint of the insured." *Allstate Ins. Co. v. Dana Corp.*, 759 N.E. 1049, 1056 (Ind. 2001). This is especially true where the language in question purports to exclude coverage. *USA Life One Ins. Co. of Ind. v. Nuckolls*, 682 N.E. 2d 534, 538 (Ind. 1997). Insurers are free to limit the coverage of their policies, but such limitations must be clearly expressed to be enforceable. *W. Bend Mut. v. Keaton*, 755 N.E.2d 652, 654 (Ind. Ct. App. 2001), *trans. denied*. "Where provisions linking coverage are not clearly and plainly expressed, the policy will be construed most favorably to the insured, to further the policy's basic purpose of indemnity." *Meridian Mut. Ins. Co v. Auto-Owners Ins. Co.*, 698 N.E.2d 770, 773 (Ind. 1998). Where ambiguity exists not because of extrinsic facts but by reason of the language used, the ambiguous terms will be construed in favor of the insured for purposes of summary judgment. *Flexdar*, 964 N.E.2d at 848.

[23] Focusing on the Related Wrongful Acts Exclusion clause in the 2012-2014 Primary Policy, the NCAA disputes its application because, applied literally, the provision's overbroad nature would negate virtually all coverage. As an alternative argument, the NCAA contends that, even if the Exclusion is not ambiguous, the alleged Wrongful Act in *Jenkins* differs from the Wrongful Act

in *White*, is unrelated and unconnected, and therefore coverage falls within the terms of the 2012-2014 Primary Policy.

[24] To support its argument that the Related Wrongful Acts Exclusion is overbroad and imprecise, the NCAA likens the clause to Indiana's precedents on pollution exclusion clauses and advocates to apply our jurisprudence in the area of environmental pollution to the language of the 2012-2014 Primary Policy. *American States Insurance Co. v. Kiger*, 662 N.E.2d 945 (Ind. 1996) concerned coverage for environmental contamination caused by leakage of gasoline from a gas station's underground storage tanks. Our supreme court held that because "the term 'pollutant' does not obviously include gasoline and, accordingly, is ambiguous, we . . . must construe the language against the insurer who drafted it." *Id*. at 949. The court reached this conclusion notwithstanding the fact that "pollutant[]" was defined in the *Kiger* policy as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." *Id*. at 948. "Clearly," the court concluded, "this clause cannot be read literally as it would negate virtually all coverage." *Id*.

[25] In *Flexdar*, our supreme court assessed the language of a pollution exclusion clause, similar to the one at issue in *Kiger*. *Flexdar*, 964 N.E.2d at 848. In evaluating the provision, the supreme court analyzed the approaches used by other courts around the country in their interpretation of absolute pollution exclusions. *Id*. at 848. The *Flexdar* court noted a division in jurisprudence between courts employing a literal approach versus those applying a situational approach in the application of exclusionary pollution clauses. *Id*. at 850. The

literal approach applies the exclusionary terms broadly, and thus "eliminates practically all coverage . . ." *Id*. at 851. Alluding to the literal approach as "yielding [] untenable results," our supreme court referenced the examples of the barring of coverage for furs in a shop smelling like curry due to a neighboring Indian restaurant and the explosion of a truck caused by vapor from oilfield waste ignited by a running diesel motor. *See id*. at 851. In contrast, the *Flexdar* court noted that other courts used the situational approach which would salvage the exclusion from its overbreadth by upholding it "only in cases of 'traditional' environmental contamination." *Id.* Rejecting this approach as workable, the court noted:

> The concept of what is a 'traditional' environmental contaminant may vary over time and has no inherent defining characteristics. This leaves courts in the awkward and inefficient position of making case-by-case determinations as to the application of the pollution exclusion.

*Id.* Not finding either approach favorable, the supreme court resorted to the application of "basic contract principles" which dictate that an "insurer can (and should) specify what falls within its . . . exclusion." *Id.* at 851. Reaffirming Indiana's 'be specific' approach, the court stated:

> Where an insurer's failure to be more specific renders its policy ambiguous, we construe the policy in favor of coverage. Our cases avoid both the sometimes untenable results produced by the literal approach and the constant judicial substance-by-substance analysis necessitated by the situational approach. In Indiana whether the TEC contamination in this case would "*ordinarily* be characterized as pollution," is, in our view, beside the point. The

question is whether the language in State Auto's policy is sufficiently ambiguous to identify TEC as a pollutant. We are compelled to conclude that it is not.

*Id.* (internal citations omitted).

[26] Turning to the policy before us, the 2012-2014 Primary Policy defines Related Wrongful Acts as "Wrongful Acts which are the same, related or continuous, or Wrongful Acts which arise from a common nucleus of facts." (Appellant's App. Vol. II, p. 194). Following *Kiger* and *Flexdar*, the NCAA claims that the exclusionary language is overbroad, ambiguous, and fails to give policyholders objective guidance as to the application of the provision. Defining "related" as "associated; connected," the NCAA maintains that every Wrongful Act insured by the policies is "related" to every other Wrongful Act insured. "At a most basic level, every act by the NCAA is 'associated' or 'connected' with every other act the NCAA takes, because the NCAA committed them all." (Appellant's Br. p. 27).

[27] We find the NCAA's focus on *Kiger* and *Flexdar* to be without merit to the situation before us. It is well-established under Indiana law that case law interpreting insurance policy language in one policy is inapplicable to different language in different policies and, as such, the NCAA's reliance on *Kiger* and *Flexdar* is misplaced. *See Tate v. Secure Ins.*, 587 N.E.2d 665 (Ind. 1992) ("The decision in [*Meridian Mut. Ins. Co. v. Richie*, 517 N.E.2d 1265(Ind. Ct. App. 119), *vacated* 540 N.E.2d 27 (Ind. 1989), *reinstated on reh'g*, 544 N.E.2d 488 (Ind. 1989)] is not applicable to the present facts because the Meridian Mutual policy

language is altogether different from that used in the Secura policy[.]"). Specifically, in *Flexdar*, our supreme court repeatedly emphasized that it was addressing one specific insurance provision, namely pollution exclusions. Subsequently, other courts discussing *Flexdar* have recognized the limited application of its holding. *See, e.g., St. Paul Fire & Marine Ins. Co. v. City of Kokomo*, 2015 WL 3907455, at *5 (S.D. Ind. June 25, 2015) ("Indiana utilizes a unique approach to determine the applicability of a pollution exclusion in an insurance policy dispute.") Accordingly, our courts' approach to reading pollution exclusions in general liability policies has no bearing on the enforcement of the related wrongful acts language in the insurance policy before us.

[28] It should be noted that the Primary Policy is a claims-based policy, which "links coverage to the claim and notice rather than the injury." *Paint Shuttle, Inc. v. Cont'l Cas. Co.*, 733 N.E.2d 513, 522 (Ind. Ct. App. 2000), *trans. denied*. "A claims-made policy protects the holder only against claims made during the life of the policy." *Id*. Consequently, "[t]he notice provision of a claims-made policy is not simply the part of the insured's duty to cooperate, it defines the limits of the insurer's obligation. If the insured does not give notice within the contractually required time period, there is simply no coverage under the policy." *Id*. The 2005-2006 Primary Policy includes language that is designed to cap the insurer's liability for multiple claims based on the same or interrelated Wrongful Acts. As such, a finding that the claims brought under *Jenkins* are related to the *White* claims pursuant to the Related Wrongful Act

language of the 2012-2014 Primary Policy will result in coverage for the *Jenkins* claim to be limited to the 2005-2006 Primary Policy's aggregate liability limit in effect during *White* and will not result in a situation where there would be no insurance coverage; rather, it merely places coverage under the original policy period in which the claim was first made.

[29] It bears emphasizing again that the Related Wrongful Act of the 2012-2014 Primary Policy is defined as:

> Wrongful Acts which are the same, related or continuous, or Wrongful Acts which arise from a common nucleus of facts. Claims can allege Related Wrongful Acts regardless of whether such Claims involve the same or different claimants, Insureds or legal causes of action.

(Appellant's App. Vol. II, p. 194). Closely related to this definition is the notice provision of the 2012-2014 Primary Policy which does not exclude coverage but aligns notice as to an initial and any subsequent "same or . . . related" Wrongful Act.

[30] In *Gregory v. Home Ins. Co.*, 876 F.2d 602, 603 (7th Cir. 1989), relied upon by the Insurers, an attorney wrote a letter concluding that a company's offering of video tapes for sale was (1) tax-advantaged, and (2) did not implicate federal securities law. Both conclusions turned out to be wrong. *Id*. Various parties brought suit against the lawyer's law firm, some regarding only the tax advantage conclusions, others based on both conclusions. *Id*. The issue before the court focused on whether these claims were related for the limits of liability

under the policy. *Id.* The Limits of Liability section of the policy provided, in pertinent part:

> Two or more claims arising out of a single act, error, omission or personal injury or a series of related acts, errors, omissions or personal injuries shall be treated as a single claim.

*Id.* at 603-04. To determine whether the various claims were "related" under the terms of the policy, the Seventh Circuit applied Indiana law and recognized that "a policy is not made ambiguous simply because the parties disagree on how it applies to a given situation." *Id*. at 605. In its analysis the court found that the term "relate" was unambiguous, explaining that

> The common understanding of the word 'related' covers a very broad range of connections, both causal and logical. However, we don't think the rule requiring insurance policies to be construed against the party who chose the language requires such a drastic restriction of the natural scope of the definition of the word 'related.' Parties are generally free to include language of their choice in contracts, and courts should refrain from rewriting them.

*Id*. at 606. The court relied on Black's Law Dictionary to note that 'related' is defined as "having a relationship, connected by reason of an established or discoverable relation." *Id*. at 606 n.5. The Seventh Circuit ultimately concluded that the claims should be treated as a single claim, subject to the per claim limit of liability. *Id*. at 606.

In *Am. Home Assurance Co. v. Allen*, 814 N.E.2d 662, 667 (Ind. Ct. App. 2004), *trans. dismissed*. this court analyzed the terms 'interrelated wrongful acts.' In its analysis, the court distinguished the *Gregory* case as it involved "the term 'related' as opposed to 'interrelated.'" *Id*. at 668. In *Gregory*, "related" was defined as a commonly understood term in everyday language and was therefore not considered ambiguous. *Id*. at 669. This court then continued:

> Here, we observe that the Policy contained the term 'interrelated,' not 'related.' . . . . [W]e find the term 'interrelated' in this insurance policy to be ambiguous. We do so for a number of reasons. First, unlike the term 'related,' 'interrelated' has no common understanding as to its meaning. Second, the Policy does not define the term. Third, the definition of 'interrelated' can be read restrictively or more expansively. The restrictive definition [] requires mutuality between the wrongful acts while the broader definition requires only parallelism between the wrongful acts. Because of the expansiveness of the definition, we agree [] that the term 'interrelated' can be interpreted as elastic and without practical boundary. Given this ambiguity, we must strictly construe the term 'interrelated' against the insurer. In so doing, we adopt the restrictive meaning [], which requires a mutual relationship or connection. We find that there is no mutuality between the alleged wrongful acts of Guffey. While the acts all flow from Guffey, the acts do not share any mutuality or interdependence among themselves. In other words, each alleged wrongful act does not impact another act that in turn impacts it.

*Id*. at 669.

Finding *Gregory* persuasive, we determine that the Related Wrongful Act provision is not ambiguous or overbroad and conclude that the *White* action

and the *Jenkins* action presented related claims, as perceived under the Primary Policies. Both the *White* and *Jenkins* action alleged a violation under Section 1 of the Sherman Act, 15 U.S.C. §1, as well as NCAA Bylaw 15, which intends to cap student-athlete remuneration in violation of the Sherman Act. The *White* action contended that, through the NCAA Constitution and the NCAA's Bylaws, including Bylaw 15, the NCAA and its members created a horizontal agreement to artificially cap remuneration to student-athletes to the value of grant-in-aid. The *Jenkins* plaintiffs continued to assail the scheme first attacked by *White* and claimed that "[t]he short-term settlement in *White*, which has since expired, with its class members no longer attending NCAA schools, did not end the NCAA's anticompetitive behavior restricting player-compensation." (Appellant's App. Vol. III, p. 138). *Jenkins* then challenged the very same framework as *White*, with specific reference to Bylaw 15:

> NCAA Bylaw 15 sets forth "Financial Aid" rules, many of which impose restrictions on the amount and nature of, and method by which, remuneration may be provided to athletes . . .

> Standing alone, these rules demonstrate a horizontal agreement among competitors to cap the amount of remuneration schools may provide athletes for their services, despite how much money these athletes may generate for their institutions and [the NCAA].

(Appellant's App. Vol. III, p. 124). The *Jenkins* class explicitly alleged these same Bylaws support the unlawful horizontal agreement alleged in the *White* action. While we agree with NCAA's allegation that *White* centered on the

cost-of-attendance gap, whereas *Jenkins* attacks both rules restricting what schools can offer student-athletes in the form of scholarships as well as rules restricting what others can offer students in the form of endorsements and direct payments, it is clear that both lawsuits essentially focus on the scheme instituted by Bylaw 15. To this end, the *Jenkins* action also attacks Bylaws 12 and 13 as these effectuate NCAA rules restricting remuneration and limiting financial aid to the grant-in-aid cap in Bylaw 15. Specifically with reference to Bylaw 12, the *Jenkins* action alleges that "[t]he NCAA falsely claims that the above-mentioned grants-in-aid [*i.e.,* Bylaw 15], which are awarded specifically in the basis of athletic ability, are not to be considered payments[,]" and this is necessary because Bylaws 12 and 13 prohibit payments to athletes and recruits, such that Bylaw 15 and grant-in-aid cannot be considered a payment. (Appellant's App. Vol. III, pp. 125-26).

[33] Accordingly, the remuneration caps imposed by the NCAA upon student-athletes under its Bylaws and characterized as a violation of the Sherman Antitrust Act are the same, related or continuous Wrongful Acts at issue in both *White* and *Jenkins* such as to constitute "Related Wrongful Acts" which implicate both the Prior Notice Exclusion and the Notice/Claim Reporting provision. The Wrongful Acts in *White* and *Jenkins* are connected through Bylaw 15 and stem from a common nucleus of facts—the scholarship scheme imposed on student-athletes. *See Gregory*, 876 F.2d at 606. Both actions sought injunctive relief and, although the definition of Related Wrongful Acts

explicitly allowed for different claimants, the actions were pursued by the same type of plaintiff—college football and men's basketball players.[3]

[34] Therefore, we conclude that the *Jenkins* action is a Claim that is considered made under the 2005-2006 Primary Policy under the Notice/Claim Reporting provision and alleges Related Wrongful Acts that are excluded under the 2012-2014 Policies pursuant to those policies' Prior Notice Exclusion. We affirm the trial court's partial summary judgment in favor of the Insurers.

# CONCLUSION

[35] Based on the foregoing, we hold that no genuine issue of material fact exists that the Related Wrongful Acts Exclusion in the NCAA insurance policies bars coverage for the NCAA in the *Jenkins* lawsuit.

[36] Affirmed.

Baker, J. and Brown, J. concur

---

[3] In a related argument, the NCAA contends that because it gave notice of *White* under the 2005-2006 Primary Policy, which was settled by the time the *Jenkins* class action suit was initiated, the Insurers could have included specific language in later policies barring coverage for suits challenging compensation restrictions. However, we adhere to the principle that an insurance company is "free to determine by its contract what risks it is undertaking to insure, provided policy provisions do not violate statutory mandates or are against public policy." *Cincinnati Ins. Co. v. Mallon*, 409 N.E.2d 1100, 1103 (Ind. Ct. App. 1980).